# United States Court of Appeals
## For the First Circuit

No. 11-1117

ROMAN CATHOLIC BISHOP OF SPRINGFIELD,
a Corporation Sole,

Plaintiff, Appellant,

v.

CITY OF SPRINGFIELD;
DOMENIC J. SARNO, in his official capacity as Mayor of the City
of Springfield; SPRINGFIELD CITY COUNCIL; PATRICK J. MARKEY, in
his official capacity as City Councilor for the City of
Springfield; WILLIAM T. FOLEY, in his official capacity as City
Councilor for the City of Springfield; ROSEMARIE MAZZA-MORIARTY,
in her official capacity as City Councilor for the City of
Springfield; TIMOTHY J. ROOKE, in his official capacity as City
Councilor for the City of Springfield; BRUCE W. STEBBINS, in his
official capacity as City Councilor for the City of Springfield;
JOSE TOSADO, in his official capacity as City Councilor for the
City of Springfield; KATERI WALSH, in her official capacity as
City Councilor for the City of Springfield; BUD L. WILLIAMS, in
his official capacity as City Councilor for the City of
Springfield; JAMES J. FERRERA, III, in his official capacity as
City Councilor for the City of Springfield,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, <u>U.S. District Judge</u>]

Before

Lynch, <u>Chief Judge</u>,
Selya and Howard, <u>Circuit Judges</u>.

     John J. Egan, with whom Stephen E. Spelman and Egan, Flanagan and Cohen, P.C. were on brief, for appellant.
     Anthony I. Wilson, Associate City Solicitor, City of Springfield, with whom Edward M. Pikula, City Solicitor, City of Springfield, was on brief, for appellee.

_____

July 22, 2013

_____

**LYNCH, Chief Judge**. The Roman Catholic Bishop of Springfield (RCB) challenges the district court's grant of summary judgment to the City of Springfield (City) and dismissal of RCB's constitutional and statutory claims against enforcement of a City ordinance that created a single-parcel historic district encompassing a church owned by RCB. Under the ordinance, RCB cannot make any changes that affect the exterior of the church, including demolition, without the permission of the Springfield Historical Commission (SHC).

RCB claims that the ordinance gives the SHC veto power over its religious decisionmaking, and in doing so violates its First Amendment rights to free speech and free exercise of religion; its rights under the federal Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc et seq.; and its rights under the Massachusetts state constitution. The district court, on cross-motions for summary judgment, found that some of RCB's claims were not ripe for review and that its remaining claims failed as a matter of law. See Roman Catholic Bishop of Springfield v. City of Springfield (RCB), 760 F. Supp. 2d 172 (D. Mass. 2011).

We conclude that only a limited claim is now ripe: namely, RCB's claim based on the mere enactment of the ordinance. But those of RCB's claims which depend on the potential consequences of compliance with the ordinance are not ripe for

-3-

adjudication, because RCB has not yet devised its plans for the church nor submitted any application to the SHC. We reach this conclusion for reasons different from the district court's. We reject the remaining ripe claim. We affirm in part and vacate in part the district court's grant of summary judgment and dismiss RCB's unripe claims without prejudice.

I.

The facts in this case are undisputed.

A.    Background

RCB is a corporation sole,[1] incorporated under the laws of Massachusetts. It is the legal entity through which the Roman Catholic Diocese of Springfield ("Diocese") operates. The Diocese covers four counties in western Massachusetts, including the county that contains the City of Springfield.

RCB owns a church in Springfield known as Our Lady of Hope ("Church"), which was built in 1925. It was designed by the Springfield architect John Donohue in the Italian Renaissance style. In 2001, the Church was deemed eligible for inclusion on the National Register of Historic Places, but it was never so placed. And until the events at issue in this case, it was never

---

[1] A corporation sole consists of only one person at a time, but the corporation may pass from one person to the next without any interruption in its legal status. Roman Catholic Bishop of Springfield v. City of Springfield (RCB), 760 F. Supp. 2d 172, 177 n.1 (D. Mass. 2011).

included in nor proposed to be included in a local historic district.

In 2004, RCB began a process known as "pastoral planning," which was designed to determine how to allocate the Diocese's financial and human resources in the face of decreasing numbers of clergy and parishioners. The process was overseen by a committee of clergy and religious and lay members of the Diocese. Part of the committee's duty was to seek and incorporate the views of members of the Diocese outside the committee itself. In August 2009, the committee issued its final report. The report recommended closing the Church and combining Our Lady of Hope Parish with another local parish. The Bishop of the Diocese accepted this recommendation, and services ceased at the Church as of January 1, 2010.

According to Roman Catholic canon law, when a church goes out of service for religious worship, the Bishop comes under an obligation to protect the religious ornamentation in and on the building so that it is not put to "sordid" use.[2] RCB identifies

_____

[2] Under canon law, a sordid use is one that is "detrimental to the good of souls," including any use that involves "[t]he denunciation of the Catholic Church and the Catholic Faith, the desecration of Catholic objects of devotion and worship or even any disrespectful or casual treatment of such objects, and/or the proselytizing of Catholics." See Roman Catholic Archbishop of Boston, A Corporation Sole's Policy on the Sale of Church Buildings, available at http://www.bostoncatholic.org/uploaded Files/BostonCatholicorg/Parishes_And_People/PolicyonSaleofChurch Buildings0711.pdf.

-5-

eight types of religious ornamentation on the exterior of the Church, including stone castings, inscriptions, and stained glass windows depicting religious scenes and symbols. Some of these features, such as friezes, are built into the structure and are not easily removable. All of these features are designed to communicate religious messages to those who observe them.

RCB has established procedures for dealing with religious symbols when a church has been closed for worship. In order of preference, it will try to: (1) relocate the items to other locations within the Diocese; (2) relocate the items to other dioceses; or (3) place the items in storage. If none of these options are possible, the objects can be destroyed.

When a closed church is sold or leased to a third party, RCB must first convert the church from religious use to "profane" (non-sacred) use in a process known as deconsecration. As part of the deconsecration process, RCB will include a clause in the sale or lease agreement obligating the purchaser or lessee either to refrain from putting the property to "sordid" use or to allow RCB to remove all religious symbols. If RCB elects to remove the religious symbols, it follows the steps outlined above. However, if the symbols are impossible or impracticable to remove (for instance, a frieze), RCB will cover them with concrete or other materials. Symbols that cannot be removed may also be destroyed --

along with the building itself, if necessary -- if RCB determines that destruction is necessary to avoid desecration.

B.        The Massachusetts Historic Districts Act (MHDA)

The MHDA delegates to cities and towns in Massachusetts the authority to designate historic districts within their boundaries.  The process of creating historic districts involves first creating a historical commission or a historic district study committee, see Mass. Gen. Laws ch. 40C, §§ 3-4; Springfield did the former when it constituted the SHC in the early 1970s.  The SHC consists of seven members and four alternates, appointed by the mayor and subject to confirmation by the City Council.

Under the MHDA, a municipality's historical commission must investigate and report on proposed historic districts before such districts can be approved by the municipality.  Id. § 3.  A proposed district "may consist of one or more parcels or lots of land, or one or more buildings or structures on one or more parcels or lots of land."  Id.  In assessing potential historic districts, a commission is to consider "the historic and architectural value and significance of the site, building or structure, the general design, arrangement, texture, material and color of the features involved, and the relation of such features to similar features of buildings and structures in the surrounding area."  Id. § 7.

When the commission completes a preliminary report on a proposed district, it transmits the report to the municipality's

planning board and to the state historical commission.  Id. § 3.
Not less than sixty days later, the municipal commission must hold
a public hearing on the report.  Id.  If the commission approves
the proposal following the public hearing, it transmits a final
report and proposed ordinance to the city council (or equivalent
body).  Id.  A two-thirds vote of the city council is required to
approve the district.  Id.

Once a historic district is approved, "no building or
structure within [the] district shall be constructed or altered in
any way that affects exterior architectural features" unless the
historical commission first issues a certificate of
appropriateness, a certificate of non-applicability, or a
certificate of hardship.  Id. § 6.  Violation of this provision is
punishable by a fine of between ten dollars and five hundred
dollars per day of violation.[3]  Id. § 13.  The statute defines
"altered" as "includ[ing] the words 'rebuilt', 'reconstructed',
'restored', 'removed' and 'demolished,'" and the word "constructed"
as "includ[ing] the words 'built', 'erected', 'installed',
'enlarged', and 'moved.'"  Id. § 5.

In order to obtain a certificate of appropriateness,
hardship, or non-applicability, a property owner must file with the

---

[3] We see no support in the statute for RCB's contention that
this provision creates a criminal penalty.  Rather, the statute
specifies that enforcement of the MHDA is committed to a court
sitting in equity.  Mass. Gen. Laws ch. 40C, § 13.

commission an application along with "such plans, elevations, specifications, material and other information . . . as may be reasonably deemed necessary by the commission to enable it to make a determination on the application."[4]  Id. § 6.  The SHC makes an application for these certificates, along with a list of its other requirements, available on the City's website.  The SHC holds public hearings on submitted applications, unless all parties entitled to notice waive the hearing.

C.      The Ordinance

The news that the pastoral planning process would result in the closing of the Church provoked significant adverse reaction

---

[4] The certificate most likely applicable to this case would be a certificate of hardship, the issuance of which depends on a commission determining whether, "owing to conditions especially affecting the building or structure involved, but not affecting the historic district generally, failure to approve an application will involve a substantial hardship, financial or otherwise, to the applicant and whether such application may be approved without substantial detriment to the public welfare and without substantial derogation from the intent and purposes of this chapter."  Mass. Gen. Laws ch. 40C, § 10(c).  If the commission makes such a finding, it "shall" issue a certificate of hardship.  Id.  In contrast, a commission "shall" issue a certificate of appropriateness when it determines "that [the proposed] construction or alteration . . . will be appropriate for or compatible with the preservation or protection of the historic district," id. § 10(a), or a certificate of nonapplicability when it determines that the proposed alteration "does not involve any exterior architectural feature, or involves an exterior architectural feature which is not then subject to review by the commission," id. § 10(b).
    For ease, the remainder of this opinion will refer to a potential certificate of hardship, without intending to exclude the possibility that RCB might have applied for one of the two other types of certificates.

among many Our Lady of Hope parishioners. The parish was one of the two largest parishes slated for closing in Springfield, and parishioners were unhappy with the prospect of being merged into another parish. In the fall of 2009, a number of Our Lady of Hope parishioners and other local citizens began lobbying the City to designate the Church as a historic district. A member of the state House of Representatives from Springfield, Sean Curran, wrote to the SHC about the matter, stating that "the closing of the church is a tremendous blow to the [Our Lady of Hope] parish, but just as alarming is the loss of the church as an architectural jewel." He urged the SHC to begin the historic district process "swiftly and without bureaucratic delay" in order to "save this beautiful building from the wrecking ball." Curran appeared before the SHC at a public meeting on September 3, 2009, where he made the same request. At that time, the SHC voted unanimously to undertake a preliminary report on creating a new historic district that would include the Church.

The SHC produced its preliminary report on September 17, 2009 -- just two weeks after the initial meeting -- outlining a proposal for the Our Lady of Hope Historic District ("District"). The proposal explained the historical and architectural reasons for creating the District. Significantly, it also stated another reason animating the proposal: the SHC noted that the Church was "slated to be closed"; that another Roman Catholic church in

-10-

Springfield had recently been closed, sold, and demolished; and that the District "[wa]s being proposed to avoid the same possible fate for Our Lady of Hope."

The preliminary report proposed a single-parcel district covering only the Church and no other property. The report justified the boundaries by describing the non-historical nature of the surrounding properties. The proposal would create the first and, at the time, only[5] single-parcel historic district in Springfield. Other multi-parcel historic districts in the City at the time contained various houses of worship. The District ultimately enacted by the City Council retained these proposed boundaries.

On October 19, 2009, the SHC received a letter from the Massachusetts Historical Commission in response to its preliminary report, giving an "advisory recommendation" in favor of the District. Acting within the statutory sixty-day window, the SHC held a public meeting to discuss the proposal on December 14, 2009. RCB's counsel appeared at this meeting to object to the creation of the District. He argued, inter alia, that creating the District would infringe RCB's constitutionally protected rights to free speech and free exercise of religion and that it would violate

_____

[5] On May 4, 2010, just over four months after the City passed the ordinance at issue in this case, it passed another ordinance creating the City's second single-parcel historic district, which also covered a church owned by RCB that was slated to be closed.

-11-

RLUIPA.  He also argued that the creation of the District was designed to intrude on the pastoral planning process at the behest of Our Lady of Hope parishioners who were angry at having their parish closed.  Finally, RCB's counsel asked that the SHC at a minimum seek a legal opinion as to the constitutional implications of approving the District.  Despite these objections, and without seeking legal advice, at the close of the meeting the SHC voted unanimously to send a final report to the City Council.

The City Council initially referred the proposal to a Council committee for study.  On December 21, 2009, RCB wrote to each Council member, reiterating its arguments against the adoption of the District and asking the Council to seek a legal opinion on the constitutionality of the District.  RCB pointed out that if the Church were designated as a historic district, it would inhibit future sale of the property, the proceeds of which would benefit the merged parish.  Historic district designation would also impose on the Diocese, and specifically on the merged parish, the continuing costs of maintenance, insurance, and security for the Church.

On December 29, 2009, the City Council held a public meeting on the proposal, even though it had not received a response from its study committee.  RCB's counsel attended the meeting and again objected to the creation of the District.  During the meeting, one councilor called in the city solicitor and asked

whether the City's law department had reviewed the proposal. The solicitor said it had not and offered to discuss the proposal with the Council in executive session, but the Council declined. Also during this meeting, another councilor asked RCB's counsel why parishioners had not had an opportunity to participate in the decision of whether to close the Church. When RCB's counsel answered that they had, the councilor exclaimed, "That isn't true!" In fact, members of the Diocese, which included Our Lady of Hope parishioners, had been invited to participate in the pastoral planning process.

At the close of the meeting, the Council passed the ordinance creating the District ("Ordinance"). RCB sent a written protest to the City's mayor, but the mayor signed the Ordinance into law the next day. The Ordinance went into effect on January 20, 2010, approximately three weeks after the last services were held at the Church.

Since the enactment of the Ordinance, RCB has taken no action with regard to the deconsecration, sale, or leasing of the Church, and it has not made any submissions to the SHC seeking permission to alter the Church's exterior. As we explain, as a result of RCB's failure to take further actions with regard to the Church site, certain of its claims lack the requisite concreteness to warrant resolution of whether hypothetical outcomes transgress RLUIPA or either the federal or state constitutions.

II.

RCB filed its complaint against the City in Massachusetts Superior Court on January 21, 2010, the day after the Ordinance went into effect. It asserted federal constitutional claims under 42 U.S.C. § 1983, federal statutory claims under RLUIPA, and state law claims under the Massachusetts Constitution and the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I.[6] RCB sought, inter alia, temporary and permanent injunctions restraining the City from enforcing the Ordinance, a declaration that the Ordinance was void, and attorneys' fees and costs. The City removed the case to the U.S. District Court for the District of Massachusetts on February 5, 2010. RCB moved for summary judgment on July 9, 2010, and the City cross-moved for summary judgment on August 13, 2010.

On January 2, 2011, the district court issued its Memorandum and Order granting summary judgment to the City. RCB, 760 F. Supp. 2d at 176. The court first found that certain of RCB's claims were not ripe for adjudication. To make this determination, the court recharacterized the complaint by dividing RCB's allegations "into two temporal facets: (1) violations that

---

[6] The complaint also named as defendants the mayor and the members of the City Council in their official capacities. The district court dismissed the claims against the individual defendants on the basis that they were actually claims against the City. RCB, 760 F. Supp. 2d at 184. RCB does not challenge this decision on appeal.

-14-

arise from the mere enactment of the single-parcel historic district, . . . and (2) violations that arise from [RCB]'s resulting inability to deconsecrate church property." Id. at 181. The court concluded that claims falling under the first heading were ripe for review because the Ordinance forced RCB to submit to a secular authority and subjected it to the "delay, uncertainty and expense" of the approval process. Id. at 181-82. On the other hand, it found that claims falling under the second heading were not ripe because RCB had not actually applied to the SHC to make any changes to the Church, so it was unknown whether RCB would be allowed to make the changes it desired. Id. at 182-84.

As to the merits of the remaining federal claims, the court found, inter alia, that the burden the Ordinance imposed on RCB was not "substantial" under RLUIPA, id. at 185-88, and that the Ordinance did not violate the antidiscrimination provisions of RLUIPA, id. at 188-91. It then erroneously focused on the MHDA rather than the Ordinance,[7] and it found that the MHDA was a

---

[7] The district court interpreted RCB's claims as a challenge to the MHDA as applied through the Ordinance, rather than as a challenge to the Ordinance itself. RCB, 760 F. Supp. 2d at 181 n.6, 190, 192-93. This was the wrong focus. The MHDA delegates to municipalities the authority to create historic districts using certain types of procedures and general criteria. See Mass. Gen. Laws ch. 40C, §§ 3-4, 7. When a municipality passes an ordinance creating a historic district, it is exercising its considerable discretion under this delegated authority; it is not "codif[ying] the City's determination that the [MHDA] applies to" the subject properties. RCB, 760 F. Supp. 2d at 181 n.6. In this opinion we analyze RCB's claims as challenges to the Ordinance itself, not to the MHDA.

neutral law of general applicability; therefore, under <u>Employment Division, Department of Human Resources of Oregon</u> v. <u>Smith</u>, 494 U.S. 872 (1990), the statute's incidental First Amendment burden on RCB was constitutionally acceptable, <u>see</u> <u>RCB</u>, 760 F. Supp. 2d at 191-93. The court also found that RCB's claim under the Massachusetts Constitution failed for the same reasons as did its claim under the "substantial burden" provision of RLUIPA.[8] <u>Id.</u> at 195.

RCB timely appealed on January 28, 2011.[9]

### III.

We review a grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party. <u>Kuperman</u> v. <u>Wrenn</u>, 645 F.3d 69, 73 (1st Cir. 2011). On an appeal from cross-motions for summary judgment, the standard does not change; we view each motion separately and draw all reasonable inferences in favor of the respective non-moving party. <u>See</u> <u>OneBeacon Am. Ins. Co.</u> v. <u>Commercial Union Assurance Co. of Can.</u>, 684 F.3d 237, 241 (1st Cir. 2012). Neither party contends that

---

[8] The district court also briefly discussed, and rejected, RCB's arguments under the federal Establishment Clause, the Fourteenth Amendment Due Process Clause, the Fourteenth Amendment Equal Protection Clause, and the Massachusetts Civil Rights Act. <u>See</u> <u>RCB</u>, 760 F. Supp. 2d at 193-95. RCB does not press any of these arguments on appeal, and we do not address them.

[9] Appellate briefing was stayed for over a year and a half as the parties attempted, unsuccessfully, to resolve their disputes in mediation.

there are any genuine issues of material fact that would justify remand for a trial.

We must begin with the City's argument that RCB's claims are not ripe for review, since the ripeness inquiry involves, as one component, the question of whether this court has jurisdiction to hear the case. See Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 8 (1st Cir. 2012) (per curiam).

"[T]he doctrine of ripeness has roots in both the Article III case or controversy requirement and in prudential considerations." Manqual v. Rotger–Sabat, 317 F.3d 45, 59 (1st Cir. 2003). The "basic rationale" of the ripeness inquiry is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).

There are two factors to consider in determining ripeness: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Id. at 149. We generally require both prongs to be satisfied in order for a claim to be considered ripe. Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995).

The fitness prong of the ripeness test has both jurisdictional and prudential components. The former, "grounded in

-17-

the prohibition against advisory opinions, is one of timing." Sindicato Puertorriqueño, 699 F.3d at 8 (quoting Mangual, 317 F.3d at 59) (internal quotation mark omitted). It concerns whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts. See id. The prudential component asks "whether resolution of the dispute should be postponed in the name of 'judicial restraint from unnecessary decision of constitutional issues'; if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision." Mangual, 317 F.3d at 59 (citation omitted) (quoting Reg'l Rail Reorg. Act Cases, 419 U.S. 102, 138 (1974)); see also Ernst & Young, 45 F.3d at 535 ("This [fitness] branch of the test typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed.").

The hardship prong, by contrast, is "wholly prudential." Mangual, 317 F.3d at 59. It looks at "whether the challenged action creates a direct and immediate dilemma for the parties." Sindicato Puertorriqueño, 699 F.3d at 9 (quoting Verizon New Eng., Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322, 651 F.3d 176, 188 (1st Cir. 2011)) (internal quotation marks omitted). "Generally, a 'mere possibility of future injury, unless it is the

cause of some present detriment, does not constitute hardship.'" Id. (quoting Simmonds v. INS, 326 F.3d 351, 360 (2d Cir. 2003)).[10]

The City argues that, because RCB has never submitted an application for a certificate of hardship, RCB cannot present any ripe claims based on the fact that the SHC might prevent RCB from implementing its religious protocols as to symbols on the exterior of the Church. RCB responds that the issues in this case are purely legal rather than factual, so no further developments -- including any developments that would result from submitting an

_____

[10] Significantly, this court has recognized in the free speech context that ripeness in First Amendment cases is subject to particular rules sensitive to the nature of the rights at issue. See Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 9 (1st Cir. 2012) (noting "the potential for 'irretrievable loss' often involved in cases where First Amendment rights are at stake" (quoting Sullivan v. City of Augusta, 511 F.3d 16, 31 (1st Cir. 2007))); see also 13B Wright & Miller, Federal Practice & Procedure § 3532.1.1 ("First Amendment challenges to land use regulation are likely to be governed by the general -- and somewhat relaxed -- ripeness tests that apply to First Amendment claims in other contexts."). Some courts have declined to apply this more relaxed standard to cases involving First Amendment (and RLUIPA) claims arising from local land use disputes. See, e.g., Grace Cmty. Church v. Lenox Twp., 544 F.3d 609, 615 (6th Cir. 2008); Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347-50 (2d Cir. 2005). These courts have reached that conclusion by relying on Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172 (1985). As we explain in the text, we do not believe that the situation here requires us to reach the question of whether Williamson County applies in this context. Thus, we do not resolve today the question of whether relaxed First Amendment ripeness standards apply generally to claims predicated on alleged Free Exercise violations, nor do we resolve the question of whether (and to what extent) Williamson County may apply to such claims. Instead we conclude that, under general principles of prudential ripeness, certain of RCB's claims are not ripe for review.

application to the SHC -- would alter the outcome. RCB also argues that it faces the hardship of having to seek the SHC's permission for every future change to the Church's exterior and that any required application for a certificate of hardship would be futile due to the City's demonstrated hostility to the Diocese's plans for the Church.

As to the first component of the fitness question, we conclude that one aspect of RCB's complaint satisfies Article III's case or controversy requirement: specifically, RCB's claim that the enactment of the Ordinance itself burdens RCB's religious practices and undermines its religious freedom. There is no doubt that the City intends to enforce the Ordinance against RCB and that RCB must submit several categories of its decisionmaking, otherwise governed by religious doctrine, to the SHC. RCB has already protested to the City regarding the practical effects of these facts on its ownership and potential disposition of Church property, including financial burdens. Under these circumstances, there is a live controversy between the parties.

But the prudential component of the fitness prong, as well as the entirely prudential hardship prong, present much closer questions as to the aspects of RCB's claim concerning the potential future results of the application process. We do not agree with RCB that there are no further factual developments that could be relevant to the outcome of this case. Indeed, both the district

court and the City have emphasized a key missing fact: RCB did not put in the record any specific plan for the sale and/or deconsecration of the Church. Nor does the record indicate that RCB made any such proposal to the City (via the Council or the SHC) before filing the instant lawsuit. Nothing has yet been presented to the SHC. Instead, RCB filed this lawsuit the very next day after the Ordinance went into effect. As such, the City has had no opportunity to demonstrate whether or not it will accommodate some, all, or none of RCB's requests for changes to the exterior of the Church. Indeed, RCB has not settled upon any plan for future use of the property that would necessarily entail changes to the Church's exterior. Without knowing what RCB can or cannot do with the Church under the Ordinance, we cannot know to what extent, if any, RCB will suffer from a burden on its religious practice.

This uncertainty likewise casts doubt on RCB's argument that any application to the SHC would be futile. The City has made it clear, both in the proceedings leading to passage of the Ordinance and throughout this lawsuit, that its purpose in passing the Ordinance was to prevent demolition of the Church. If RCB had proffered evidence that it in fact planned to demolish the Church, in accordance with the requirements of its deconsecration procedures, then RCB may have been able to make the futility argument. See Gilbert v. City of Cambridge, 932 F.2d 51, 61 (1st Cir. 1991) (stating, in zoning context, that futility may be

-21-

sufficient to show ripeness where the plaintiff faces "a sort of inevitability . . . : the prospect of refusal [of an application] must be certain (or nearly so)," not merely possible or even probable). But the City has not represented that it would deny all applications to alter the exterior of the Church in any way, and RCB has not offered evidence to suggest that the City would deny all such applications. Given this uncertainty, we cannot conclude that RCB's claims premised on its feared inability to deconsecrate the Church according to its religious principles, as a result of future SHC decisions, are now fit for adjudication.[11]

In reaching this conclusion, we rely on traditional notions of ripeness. We do not rely, as did the district court, on specialized Takings Clause ripeness doctrine. In regulatory takings cases, a property owner must follow the procedures for requesting the applicable zoning relief, and have its request denied, before bringing a claim in court. Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 190-91 (1985). But the Supreme Court has stated that this requirement "is compelled by the very nature of the inquiry required by the Just Compensation

---

[11] Because we conclude that RCB's claims based on its possible prospective inability to deconsecrate the Church fail the prudential component of the ripeness test, we need not address whether those claims would satisfy the constitutional component. See Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

Clause." Id. at 190; see 13B Wright & Miller, Federal Practice & Procedure § 3532.1.1 (describing takings cases as comprising "[a] special category of ripeness doctrine"). Specifically, regulatory takings inquiries focus on the economic impact of a regulation on the subject property, and that impact is only apparent once there is a final zoning decision. See Williamson Cnty., 473 U.S. at 191. The ripeness inquiry in takings cases also involves a question of the adequacy of alternative procedures to obtain just compensation. See Horne v. Dep't of Agric., 133 S. Ct. 2053, 2062 (2013).

Here, by contrast, the Ordinance's effect on RCB's free exercise rights may well become clear at a different point than that contemplated by takings law. While constitutional challenges to land use regulations may implicate Williamson County's ripeness doctrine in some cases, we find no such necessary implication here. It is significant, in this respect, that the Ordinance is designed to apply only to the Church, unlike the neutral and generally applicable zoning or environmental ordinances that are almost always at issue when a regulatory takings claim is alleged.[12]

---

[12] Like us, other circuits have found that the Williamson County analysis is sometimes inapposite for non-Takings constitutional challenges to land use decisions. See, e.g., Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 89-91 (2d Cir. 2002) (First Amendment retaliation claim); Nasierowski Bros. Inv. Co. v. City of Sterling Heights, 949 F.2d 890, 894 (6th Cir. 1991) (procedural due process claim). But see Grace Cmty. Church, 544 F.3d at 617-18 (procedural due process claims are exception to the general application of Williamson County); Murphy, 402 F.3d at 350-51 (applying Williamson County to RLUIPA and First Amendment free exercise claims).

To the extent that RCB has argued that the mere existence of the Ordinance creates a ripe controversy, we find that its claims are ripe. With regard to this attack on the enactment of the Ordinance, RCB has credibly alleged that the requirement of submitting to the SHC's authority presently imposes delay, uncertainty, and expense, which is sufficient to show present injury. See Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 288 (5th Cir. 2012) (considering inability to use property as intended as a factor in the ripeness inquiry). Of course, the extent and significance of this alleged injury is a merits question. For the purposes of the ripeness inquiry, it is enough to note that it is self-evidently plausible that they exist.

RCB also argues that the requirement of subjecting its religious decisions regarding deconsecration to secular administrators at all creates a present burden on its free exercise of religion. Cf. Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc., 501 U.S. 252, 265 n.13 (1991) (concluding that constitutional separation-of-powers challenge to "veto power" of administrative board was ripe "even if the veto power has not been exercised to respondents' detriment," because "[t]he threat of the veto hangs over the [decisionmakers subject to the veto power] like the sword over Damocles, creating a 'here-and-now subservience' . . . sufficient to raise constitutional questions"). Finally, RCB points out that if it

were to make any changes to the exterior of the Church without the SHC's permission, it would be subject to a statutory fine for each day the changes persisted.  See Mass. Gen. Laws ch. 40C, § 13.

Under these circumstances, we conclude that RCB's challenges to the enactment of the Ordinance satisfy the prudential fitness and hardship requirements of the ripeness test.  Because these challenges rest solely on the existence of the Ordinance, no further factual development is necessary, and the Ordinance's existence does confront RCB with a "direct and immediate dilemma." Sindicato Puertorriqueño, 699 F.3d at 9 (quoting Verizon New Eng., 651 F.3d at 188).

IV.

We turn to the merits of the ripe claim, beginning with RCB's RLUIPA arguments.

A.       RLUIPA "Substantial Burden"

RCB first argues that the Ordinance violates RLUIPA's "substantial burden" provision, 42 U.S.C. § 2000cc(a), which states:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution--
>       (A) is in furtherance of a compelling governmental interest; and
>       (B) is the least restrictive means of furthering that compelling governmental interest.

-25-

42 U.S.C. § 2000cc(a)(1).  The parties do not dispute that the Ordinance is a "land use regulation" within the meaning of the statute.  RCB, 760 F. Supp. 2d at 186.

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A), and it specifically provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise," id. § 2000cc-5(7)(B).  The district court correctly determined that deconsecration constitutes religious exercise under the statute.  RCB, 760 F. Supp. 2d at 186.  The City concedes that point for purposes of this appeal.

### 1.    Standard of Review

The Supreme Court has not decided whether a district court's ultimate conclusion as to the existence of a substantial burden under RLUIPA is an issue of fact or law, nor the appellate standard of review for this issue.  Nor have the circuit courts answered the question.  See, e.g., World Outreach Conference Ctr. v. City of Chicago, 591 F.3d 531, 539 (7th Cir. 2009).  Of course, if a district court had made subsidiary findings resolving disputed issues of fact, those findings would be subject to clear error review.  But because this case was resolved on summary judgment, that situation is not before us.

Rather, in the circumstances presented here -- where there are no contested findings of fact, and where neither party argues that there are material issues of fact for trial -- we view the question of whether a "substantial burden" exists as a question of law subject to de novo review. Among the reasons for our approach are two considerations.

First, the corollary question of whether the government's interest is compelling is generally treated as a question of law. See, e.g., McRae v. Johnson, 261 F. App'x 554, 557 (4th Cir. 2008) (per curiam); United States v. Hardman, 297 F.3d 1116, 1127 (10th Cir. 2002) (interpreting analogous RFRA provision).

Second, in cases raising challenges under the Free Speech Clause of the First Amendment, we have stated that an appellate court "must conduct an 'independent review of the evidence on the dispositive constitutional issue' . . . in order to safeguard precious First Amendment liberties." Veilleux v. Nat'l Broad. Co., 206 F.3d 92, 106 (1st Cir. 2000) (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 508 (1984)); see AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth., 42 F.3d 1, 7 (1st Cir. 1994) ("[W]here the trial court is called upon to resolve a number of mixed fact/law matters which implicate core First Amendment concerns, our review, at least on these matters, is plenary . . . ."). We see no reason why this should not be true of

-27-

RLUIPA claims, which are corollaries of First Amendment Free Exercise claims.

    2.      Content of "Substantial Burden"

RCB bears the burden of demonstrating that the enactment of the Ordinance imposes a "substantial burden" on its religious exercise.  RLUIPA does not define "substantial burden," although the background of the statute's enactment provides some indication of Congress's intended meaning.

The pertinent background begins with Employment Division v. Smith, 494 U.S. 872, in which the Supreme Court held that the Free Exercise Clause does not relieve individuals of the obligation to comply with neutral laws of general applicability that burden their religious exercise.[13]  See id. at 879.  Congress responded to Smith by passing the Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488.  This statute purported to overturn Smith and reinstate the free exercise standard announced in Sherbert v. Verner, 374 U.S. 398 (1963), and Wisconsin v. Yoder, 406 U.S. 205 (1972), which had required the government to demonstrate a compelling interest in order to justify a substantial burden on religious practices.  See RFRA, Pub. L. No. 103-141, § 2(a)(4)-(5), (b)(1); Sherbert, 374 U.S. at 406-07.  The Court then struck down the RFRA as applied to the states and their

_____

[13] The City has not argued that a finding that the Ordinance violates RLUIPA would run afoul of the Establishment Clause.  See Cutter v. Wilkinson, 544 U.S. 709, 713-14 (2005).

-28-

subdivisions, holding it outside the scope of Congress's enforcement powers under Section 5 of the Fourteenth Amendment. City of Boerne v. Flores, 521 U.S. 507, 519, 532 (1997).

Congress responded again by passing RLUIPA, this time relying on the Spending and Commerce Clauses and targeting only two areas of state regulation: land use and institutionalized persons. See Cutter v. Wilkinson, 544 U.S. 709, 715 (2005). RLUIPA established the same rule for these two limited areas that Congress had attempted to apply more broadly in the RFRA: it prohibited state and local governments from placing a substantial burden on religious exercise unless the government could show that it had a compelling interest and that it had used the least restrictive means to achieve that interest. Compare RFRA, Pub. L. No. 103-141, § 3(b), with 42 U.S.C. § 2000cc(a)(1). The congressional record accompanying the passage of RLUIPA in the Senate indicates that the sponsors of the law intended the phrase "substantial burden" to be "interpreted by reference to Supreme Court jurisprudence." 146 Cong. Rec. S7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy).

The Supreme Court, however, has never provided a working definition of "substantial burden" in this context. As the Second Circuit has noted, Sherbert -- one of the cases on which Congress relied in formulating its statutory test -- approached the "substantial burden" question in terms of a choice between

-29-

following one's religion and obtaining government benefits (there, unemployment benefits), <u>see</u> 374 U.S. at 399-400, a type of choice that does not accurately describe the situation in religious land use disputes.  <u>See</u> <u>Westchester Day Sch.</u> v. <u>Village of Mamaroneck</u>, 504 F.3d 338, 348-49 (2d Cir. 2007).

The First Circuit has not offered its own interpretation of "substantial burden" for RLUIPA land use purposes.  The parties offer various abstract formulations to us.  A number of other circuits have announced tests in terms of such abstract formulations, but the standards they have announced have not been consistent.  <u>See,</u> <u>e.g.</u>, <u>Bethel World Outreach Ministries</u> v. <u>Montgomery Cnty. Council</u>, 706 F.3d 548, 556 (4th Cir. 2013) ("[A] plaintiff can succeed on a [RLUIPA] substantial burden claim by establishing that a government regulation puts substantial pressure on it to modify its behavior."); <u>Westchester Day Sch.</u>, 504 F.3d at 349 (formulating the question as whether "government action . . . directly coerces the religious institution to change its behavior" (emphasis omitted)); <u>Living Water Church of God</u> v. <u>Charter Twp. of Meridian</u>, 258 F. App'x 729, 737 (6th Cir. 2007) (asking whether, "though the government action may make religious exercise more expensive or difficult, does the government action place substantial pressure on a religious institution to violate its religious beliefs or effectively bar a religious institution from using its property in the exercise of its religion?"); <u>Midrash</u>

-30-

<u>Sephardi, Inc.</u> v. <u>Town of Surfside</u>, 366 F.3d 1214, 1227 (11th Cir. 2004) (substantial burden is one that "place[s] more than an inconvenience on religious exercise" and is "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly"); <u>San Jose Christian Coll.</u> v. <u>City of Morgan Hill</u>, 360 F.3d 1024, 1034 (9th Cir. 2004) ("[F]or a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent."); <u>Civil Liberties for Urban Believers</u> v. <u>City of Chicago</u>, 342 F.3d 752, 761 (7th Cir. 2003) ("[I]n the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable.").

In the absence of Supreme Court guidance, we do not adopt any abstract test, but rather identify some relevant factors and use a functional approach to the facts of a particular case. We recognize different types of burdens and that such burdens may cumulate to become substantial. At least one circuit has moved in this direction, <u>see</u> <u>World Outreach Conference Ctr.</u>, 591 F.3d at 539 ("[W]hether a given burden is substantial depends on its magnitude in relation to the needs and resources of the religious organization in question."), and academic commentary has suggested the same, <u>see</u> R. Bernstein, Note, <u>Abandoning the Use of Abstract</u>

Formulations in Interpreting RLUIPA's Substantial Burden Provision in Religious Land Use Cases, 36 Colum. J.L. & Arts 283, 305-10 (2013) (explaining common factors that courts have considered in assessing "substantial burden" under RLUIPA, regardless of how the standard has been formulated).

This approach involves consideration of the common-usage understandings of the term "substantial burden," a term used in many areas of law without particular abstract formulations. A "burden" is "[s]omething that hinders or oppresses," Black's Law Dictionary 223 (9th ed. 2009), or "something oppressive or worrisome," Merriam-Webster's Collegiate Dictionary 152 (10th ed. 1993); see also "Burden/burthen, n.," Oxford English Dictionary, available at http://www.oed.com/viewdictionaryentry/Entry/24885 ("An obligatory expense, whether due on private account or as a contribution to national funds; often with the additional notion of pressing heavily upon industry and restraining freedom of action."). Next, something is "substantial" when it is "important" or "significantly great," Merriam-Webster's Collegiate Dictionary 1174 (10th ed. 1993); see also "Substantial, adj., n., and adv.," Oxford English Dictionary, available at http://www.oed.com/viewdictionaryentry/Entry/193050 (as to an action or measure, "having weight, force, or effect; effective, thorough"). A burden does not need to be disabling to be substantial. We do not agree with those courts that have suggested that nothing short of

coercion to change or abandon one's religious beliefs can meet the substantial burden test.

On the other hand, we agree with the Second Circuit's observation that RLUIPA does not mean that any land use restriction on a religious organization imposes a substantial burden -- such a conclusion would stretch First Amendment jurisprudence too far, see Westchester Day Sch., 504 F.3d at 349-50, and moreover would be contrary to congressional intent, see 146 Cong. Rec. S7776 (daily ed. July 27, 2000) ("This Act does not provide religious institutions with immunity from land use regulation . . . .") (joint statement of Sens. Hatch and Kennedy).

We do identify some factors that courts have considered relevant when determining whether a particular land use restriction imposes a substantial burden on a particular religious organization, but we do not suggest that this is an exhaustive list. One factor is whether the regulation at issue appears to target a religion, religious practice, or members of a religious organization because of hostility to that religion itself. See Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895, 898 (7th Cir. 2005) (noting that city had allowed rezoning of parcel owned by Protestant church but imposed additional processes on, and ultimately denied, Greek Orthodox church's rezoning application for adjacent parcel); id. at 900 (warning of the "vulnerability of religious institutions --

especially those that are not affiliated with the mainstream [Christian] sects . . . to subtle forms of discrimination"); cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532-33 (1993).

Another is whether local regulators have subjected the religious organization to a process that may appear neutral on its face but in practice is designed to reach a predetermined outcome contrary to the group's requests. See, e.g., World Outreach Conference Ctr., 591 F.3d at 537-38 (finding that religious organization stated a RLUIPA substantial burden claim where city insisted that organization seek a permit it did not need, then used other processes to "pull[] the rug out from under" organization's application, id. at 537); Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter, 456 F.3d 978, 989 (9th Cir. 2006) (finding substantial burden where the religious organization "readily agreed to every mitigation measure suggested by [regulators], but the County, without explanation, found such cooperation insufficient," and the "broad reasons" given for the county's denials "could easily apply to all future applications" by the organization).

Courts have also looked to whether the land use restriction was "imposed on the religious institution arbitrarily, capriciously, or unlawfully." Westchester Day Sch., 504 F.3d at 350. This may occur where, for instance, local regulators disregard objective criteria and instead act adversely to a

-34-

religious organization based on the objections of a "small but influential" group in the community. Id. at 346 (noting that "[m]any of the[] grounds" for zoning board's denial of religious institution's building permit application "were conceived after the [board] closed its hearing process, giving the school no opportunity to respond," and that "the stated reasons for denying the application were not supported by evidence," leading the district court to "surmise[] that the application was in fact denied because the [board] gave undue deference to the public opposition of the small but influential group of neighbors who were against the school's expansion plans"). It may also occur where local regulators base their decisions on misunderstandings of legal principles. See Saints Constantine, 396 F.3d at 899-900 (describing "repeated legal errors" by the city, suggesting that errors were indicative of city either being "deeply confused about the law" or "playing a delaying game," and warning of risks to religion where, as in zoning processes, "a state delegates essentially standardless discretion to nonprofessionals operating without procedural safeguards").

Taken together, these factors reveal that the substantial burden analysis often "backstops the explicit prohibition of religious discrimination in" RLUIPA's subsection (b) much in the same way as "the disparate-impact theory of employment discrimination backstops the prohibition of intentional

-35-

discrimination."  Id. at 900.  Under the substantial burden framework, a court may block application of a land use regulation under RLUIPA's subsection (a) where the context raises an "inference" of hostility to a religious organization, even when the evidence does not necessarily show the explicit discrimination "on the basis of religion" contemplated by subsection (b).  Id. Several courts have been sensitive to these concerns.  See, e.g., Westchester Day Sch., 504 F.3d at 350-51; World Outreach Conference Ctr., 591 F.3d at 535-38 (reversing dismissal of religious organization's RLUIPA substantial burden claim, while affirming dismissal of organization's RLUIPA discrimination claim).

### 3.    De Novo Review of Substantial Burden Analysis

We start with two bedrock observations: first, that a religious organization is protected from government burdens which are imposed based on the organization's religious beliefs; and second, that the Ordinance at issue in this case cannot be viewed as a neutral law of general applicability in the Smith sense.

As to the first issue, a government may not single out for special benefit or burden a religious group or institution solely because of its religious beliefs.  See id. at 532.  Here, nothing in the language nor the background of the Ordinance indicates that hostility to Catholicism or Catholics motivated the City's decisionmaking process.  The language of the Ordinance does not target deconsecration as such.

By its terms, the Ordinance does not forbid the SHC from inquiring into the religious criteria that RCB uses to determine how it will apply its religious protocols, nor from second-guessing the religious conclusions reached by RCB as to what is sacred. In this respect, the Ordinance stands in contrast with at least some other historic zoning ordinances which expressly prohibit local historical commissions from interfering in liturgical decisions. See, e.g., First Covenant Church of Seattle v. City of Seattle, 840 P.2d 174, 178 (Wash. 1992); cf. Sherbert, 374 U.S. at 402 ("The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious beliefs as such."). But RCB has not alleged that the SHC will engage in these forbidden practices, nor has it argued that the SHC has historically done so with regard to any other religious buildings. The Ordinance merely requires RCB to undertake an administrative process common to all historic districts. We will not assume that the SHC will use its authority to transgress these forbidden lines of challenging liturgical criteria or conclusions, without evidence that it has done so.

As to the second issue, we do not view the Ordinance as a "neutral law of general applicability" in the sense that the Supreme Court used the term in Smith. See 494 U.S. at 879 (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)); id. at 879-82. Rather, the City,

through the SHC and City Council, is vested with discretion to decide when to create a historic district. The strictures imposed as a result of historic district status do not apply automatically by statute to the general population, but apply once certain officials of the City decide that they will apply. Historic district or landmark ordinances are different from other types of zoning rules in that their entire purpose is to prevent only particular property owners in limited areas from changing the appearance of particular properties.[14] In this sense, it can be said that the Ordinance is not "generally applicable."

One of the dangers of a discretionary system such as this one is the prospect that the government's discretion will be misused. In this case, there were some troubling circumstances surrounding the City's enactment of the Ordinance. For instance, the Ordinance was proposed after the news was released that RCB planned to close the Church, and it was supported by parishioners opposed to the (otherwise unreviewable) closing decision and those sympathetic to their cause. The record does not indicate any interest in including the Church in a historic district before that

---

[14] We note that, given the nature of historic district designations, the mere fact that the Ordinance is concerned with only one building, and that that one building is a church, does not in itself resolve the burden question. See Rector, Wardens, & Members of the Vestry of Saint Bartholomew's Church v. City of New York, 914 F.2d 348, 354 (2d Cir. 1990). It is the nature of the burden -- not the character of the law -- that controls our analysis.

decision in the late summer of 2009.[15]  See Lukumi, 508 U.S. at 540-41 (noting significance of fact that ordinances regarding animal sacrifice were enacted in direct response to news that a Santería church would open in town).  The SHC report acknowledges that part of the City's intent in creating the District was to prevent RCB from following the same path it had taken with another local church, which had been closed, deconsecrated, and sold to a developer who demolished it.  It was arguably because RCB might conclude that demolition of the Church was required that the City chose to intervene.

The SHC, City Council, and mayor pressed the Ordinance through the approval process quickly, in a matter of weeks, coinciding with the timeline of the Church's closing (the Ordinance became law on December 30, 2009, and went into effect on January 20, 2010; the last services at the Church were held on January 1, 2010).  The City's officials took these actions without considering the Ordinance's potential constitutional implications, despite repeated requests by RCB for a legal consultation and an offer by the City's solicitor to provide legal advice.  Cf. Saints Constantine, 396 F.3d at 899 ("The repeated legal errors by the City's officials casts doubt on their good faith.").  The City Council did not even wait for the report of its own study committee

_____

[15] The SHC's report mentions that the Church was surveyed for possible inclusion in the National Register of Historic Places in 2001, but apparently no action was taken between 2001 and 2009.

before approving the District.  At the City Council hearing, one councilor accused RCB's counsel of lying about RCB's decisionmaking process in closing the Church, suggesting dissatisfaction with that religiously motivated decision.  <u>Cf.</u> <u>Rector, Wardens, & Members of the Vestry of Saint Bartholomew's Church</u> v. <u>City of New York</u>, 914 F.2d 348, 355 (2d Cir. 1990) (holding that landmarking laws can permissibly single out individual parcels, "<u>absent proof of the discriminatory exercise of discretion</u>" in identifying such parcels (emphasis added)).

In the end, however, these troubling facts surrounding the enactment of the Ordinance are not outcome determinative, because this exercise of discretion (that is, designating the Church as a single-parcel historic district) does not establish a process, apparently neutral, that in fact will result in the denial of any request that RCB may make to the SHC.  <u>See, e.g.</u>, <u>World Outreach Conference Ctr.</u>, 591 F.3d at 537-38; <u>Guru Nanak Sikh Soc'y</u>, 456 F.3d at 989.  The Ordinance requires only that RCB submit any plans to alter the exterior of the Church to the SHC. Should the SHC in fact prevent RCB, when it does have specific plans for the site, from undertaking any portion of its religious practice of deconsecration, the significance of the Ordinance's background can be evaluated anew in the context of any later challenge.

In addition to the two concerns outlined above, we evaluate the actual, tangible burdens that existence of the Ordinance imposes on RCB. RCB represented to the City Council that it must bear a financial burden of maintaining the Church, which falls on the newly merged parish and constrains RCB's decisions about how to allocate the Diocese's resources. But the mere existence of some expenses does not put "substantial pressure on [RCB] to modify its behavior." Bethel World Outreach, 706 F.3d at 556. There are many scenarios under which RCB would be paying to maintain the Church, only some of which are fairly traceable to the Ordinance. Further, RCB did not submit evidence of the degree of these expenses, nor of the Church's property value before or after passage of the Ordinance. See, e.g., First Covenant Church of Seattle, 840 P.2d at 183 (noting, in constitutional substantial burden analysis, evidence that landmark ordinance "reduce[d] the value of the Church's property by almost half").

RCB does face statutory penalties if it makes any changes to the Church without the SHC's permission, see Mass. Gen. Laws ch. 40C, § 13, but this possibility does not mean that the process of application to the SHC is itself burdensome. The Ordinance asks RCB only to delay the decisions it makes pursuant to its deconsecration plans while the SHC evaluates its application, a

process that, according to the SHC's own rules, should take no more than sixty days.[16]

In this case, all of the factors we have identified combine to show that RCB cannot, solely on its challenge to the enactment of the Ordinance, prove that it suffers a substantial burden on its religious exercise.

Because we decide that RCB has not shown a substantial burden, we need not address the question of whether the Ordinance is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering" that interest. 42 U.S.C. § 2000cc(a)(1)(A)-(B).

B.        RLUIPA "Equal Terms"

RCB also argues before this court that the Ordinance violates another provision of RLUIPA, the "equal terms" provision,[17] which states: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). RCB argues that the

---

[16] If the SHC does not act on an application within sixty days, it "shall" issue the requested certificate of hardship.

[17] In the district court, RCB also argued that the Ordinance violated RLUIPA's "nondiscrimination" and "unreasonable limitations" provisions. 42 U.S.C. § 2000cc(b)(2)-(3); see RCB, 760 F. Supp. 2d at 191. RCB did not address those two provisions in its opening brief to this court, and the City argues that any claims based on those provisions are waived. We agree with the City.

City violated this provision because the District was, at the time of its enactment, the only single-parcel historic district in Springfield.

The circuits disagree as to the applicable comparator in a RLUIPA "equal terms" analysis. Compare Midrash Sephardi, 366 F.3d at 1230-31 ("natural perimeter" of inquiry is the universe of entities which qualify as "assembl[ies] or institution[s]"), with Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253, 264 (3d Cir. 2007) (religious institution must show that a secular comparator is similarly situated in relevant respects). RCB does not point to any particular secular institution or class of institutions that was treated differently than was RCB. Rather, RCB compares itself to every secular institution in the City of Springfield, none of which are included in a single-parcel historic district. Under any reasonable interpretation of the equal terms provision, this argument fails.

The MHDA empowers municipalities to choose how many parcels to include in any given historic district. The City has enacted a number of historic districts over the years, of varying sizes, and often including both secular and religious buildings. The City complied with the MHDA's process for designating the District, as it presumably did in all other instances when it created historic districts.

By analogy, the Supreme Court has recognized in a different context that landmark laws -- which operate similarly to single-parcel historic districts -- are not necessarily operating in a discriminatory manner when they single out particular parcels for special treatment:

> [L]andmark laws are not like discriminatory, or "reverse spot," zoning: that is, a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones. In contrast to discriminatory zoning, which is the antithesis of land-use control as part of some comprehensive plan, the [landmark] law embodies a comprehensive plan to preserve structures of historic or aesthetic interest wherever they might be found in the city[.]

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 132 (1978) (citation omitted). Likewise, the mere fact that a landmark designation or a single-parcel historic district applies only to a house of worship does not in itself constitute a targeting of religion that offends the First Amendment. See Saint Bartholomew's, 914 F.2d at 354.

The mere fact of the Ordinance's existence does not demonstrate that RCB was treated on less than equal terms with nonreligious institutions, particularly where RCB does not point to any relevant comparators.

C.      First Amendment Claims

        1.      Free Exercise of Religion

-44-

RLUIPA's congressional record indicates that the sponsors of the law in the Senate intended the phrase "substantial burden" to be interpreted consonantly with the Supreme Court's usage of the phrase in the First Amendment context. See 146 Cong. Rec. S7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy). Our analysis of RCB's ripe First Amendment free exercise claim is thus similar to our analysis of the ripe "substantial burden" question under RLUIPA.

Because we do not view the Ordinance as a neutral law of general applicability, we will assume, favorably to RCB, that it is subject to strict scrutiny.[18] See Lukumi, 508 U.S. at 546; Jimmy Swaggart Ministries v. Bd. of Equalization of Cal., 493 U.S. 378, 384-85 (1990) ("Our cases have established that '[t]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden.'" (alteration in original) (quoting Hernandez v. Comm'r, 490 U.S. 680, 699 (1989))). For the same reasons we have already explored, RCB has not shown that the mere existence of the Ordinance constitutes a substantial burden on its First Amendment right to the free exercise of religion.

---

[18] We need not address the parties' arguments as to what standard of scrutiny applies to a "hybrid" claim -- that is, one that combines an alleged violation of the free exercise right with another alleged constitutional violation. Cf. Smith, 494 U.S. at 881-82.

-45-

Given the limited nature of the only ripe claim before us, the Supreme Court's decision in <u>Lukumi</u> is not to the contrary. There, a municipality passed ordinances relating to animal sacrifice that were clearly designed to prevent adherents of Santería from taking part in a specific religious practice, for the stated purpose of prohibiting a religious exercise that a number of citizens considered to be "inconsistent with public morals, peace or safety." 508 U.S. at 535. The evidence as a whole revealed that "suppression of the central element of the Santeria worship service was the object of the ordinances," <u>id.</u> at 534, which constituted "an impermissible attempt to target petitioners and their religious practices," <u>id.</u> at 535.

Here, by contrast, there is no evidence that suppression of Catholic religious practices was the object of the Ordinance. The text of the Ordinance requires only that RCB file an application with the SHC before making any changes to the exterior of the Church. The language of the Ordinance does not require RCB to perform or forego any particular practice, and it does not prohibit deconsecration or even closing of the Church outright. While the circumstances of the Ordinance's enactment reveal that the Ordinance was motivated at least in part by a desire to prevent demolition of the Church -- a possible outcome of RCB's religious decisionmaking process -- there is no evidence that this goal was

rooted in "animosity to religion or distrust of its practices." Id. at 547.

This is not to say, of course, that a government's benign motives will always defeat a claim of substantial burden; a law passed without any evidence of animosity may still, by its objective terms, impose such a burden. But that is not this Ordinance. Again, the question of whether any future outcome of RCB's submission of an application to the SHC might constitute a substantial burden is not properly before this court. We hold simply that the existence of the Ordinance itself is not an unconstitutional burden on RCB's free exercise of religion.

2.     Freedom of Speech

RCB's complaint alleged that the Ordinance violated its rights under the First Amendment's Free Speech Clause. RCB alludes to that claim in its briefing before this court, but it does not develop the argument, instead using the free speech claim solely to bolster its argument that the free exercise claim should be subject to strict scrutiny as a "hybrid" claim. RCB has thus waived this issue on this appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

We note, however, that the district court found that the free speech claim was unripe, because the question of whether the Ordinance interferes with RCB's right to express itself through religious symbols on the Church would not be cognizable until the

SHC acted on an application to remove any of those symbols.  See RCB, 760 F. Supp. 2d at 184.  Since neither party asks us to disturb that ruling, we will not do so.

D.        Massachusetts State Constitutional Claims

Finally, RCB argues that the enactment of the Ordinance violates its free exercise right under Article 46, Section 1 of the Amendments to the Massachusetts Constitution, which provides that "[n]o law shall be passed prohibiting the free exercise of religion."  In interpreting this provision, Massachusetts has rejected the Supreme Court's Smith rule and retained the strict scrutiny standard even for laws that are neutral and generally applicable.  Attorney General v. Desilets, 636 N.E.2d 233, 236 & n.4 (Mass. 1994).  Because we have rejected RCB's federal constitutional challenge as to that part of its claim which is ripe, RCB's ripe state constitutional claim also fails, for the same reasons articulated above.[19]

V.

RCB has presented a serious set of challenges.  As the Supreme Court has stressed, the question of religious burdens is necessarily individualized and context-sensitive.  See Gonzales v.

---

[19] Because we conclude that RCB has not demonstrated a substantial burden on its religious exercise, we need not address the unsettled state law question of whether there can be a compelling state interest in the historic preservation of the exterior of a house of worship.  See Soc'y of Jesus of New Eng. v. Bos. Landmarks Comm'n, 564 N.E.2d 571, 572 n.2 (Mass. 1990).

<u>O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 436 (2006). Accordingly, we have written narrowly today. Our analysis is grounded in the present facts of this case.

VI.

It appears from the district court's decision that the court granted summary judgment to the City on all of RCB's claims. <u>See</u> <u>RCB</u>, 760 F. Supp. 2d at 195. This was, in part, erroneous. The claims that the district court found were unripe should have been dismissed without prejudice, not resolved on summary judgment. We will remand for the proper disposition of those claims.

VII.

The judgment of the district court is <u>affirmed in part</u> and <u>vacated in part</u>. The district court's grant of summary judgment to the City on Counts 5, 6, 7, 10, 11, and 12 of RCB's complaint is <u>affirmed</u>. We <u>vacate</u> the grant of summary judgment to the City on Counts 3 and 4 of the complaint and <u>remand</u> with instructions to dismiss those counts without prejudice. We <u>vacate</u> and <u>remand</u> with instructions to dismiss without prejudice Counts 1, 2, 8, and 9 of the complaint, to the extent these counts allege a challenge to the potential future effects of the application process under the Ordinance. To the extent that Counts 1, 2, 8, and 9 allege a challenge to the mere enactment of the Ordinance, the grant of summary judgment to the City is <u>affirmed</u>. Each party shall bear its own costs.