# United States Court of Appeals

## For the First Circuit

No. 21-1463

ST. PAUL'S FOUNDATION; SHRINE OF ST. NICHOLAS THE WONDERWORKER,
PATRON OF SAILORS, BREWERS AND REPENTANT THIEVES,

Plaintiffs, Appellants,

v.

ROBERT IVES, in his official capacity as Interim Building
Commissioner for the Town of Marblehead; TOWN OF MARBLEHEAD,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Kevin P. Martin, with whom Michael K. Murray, William E. Evans
III, and Goodwin Procter LLP were on brief, for appellants.
Felicia H. Ellsworth, Eric L. Hawkins, Simon B. Kress, and
Wilmer Cutler Pickering Hale and Dorr LLP, on brief for the
Orthodox Church in America and the Union of Orthodox Jewish
Congregations of America, amici curiae.
Gregor A. Pagnini, with whom Leonard H. Kesten, Deidre Brennan
Regan, and Brody, Hardoon, Perkins & Kesten, LLP were on brief,
for appellees.

March 24, 2022

BARRON, **Circuit Judge**.  This case arises from a suit under the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  The plaintiffs, St. Paul's Foundation and the Shrine of St. Nicholas the Wonderworker, Patron of Sailors, Brewers and Repentant Thieves (collectively, "St. Paul's"), claim that their religious exercise was substantially burdened in violation of RLUIPA by the defendants, the Town of Marblehead (the "Town") and its Buildings Commissioner.  The dispute concerns the defendants' failure to reinstate a building permit that St. Paul's had secured for the redevelopment of the site in the Town on which the Shrine of St. Nicholas is located but that had been suspended prior to the completion of that construction.  The District Court granted summary judgment to the defendants.  We affirm.

## I.

We set forth some relevant legal background as well as some basic facts relating to the underlying claim that are not in dispute between the parties on appeal.  See United States v. Union Bank for Savs. & Inv. (Jordan), 487 F.3d 8, 11 (1st Cir. 2007).  We also review the travel of the case.

## A.

Under Massachusetts law, parties seeking to perform construction work on buildings must apply for and receive two permits before the finished building can be used or occupied.  First, before construction begins, a local building commissioner

- 3 -

must issue a building permit authorizing specific construction. 780 Mass. Code Regs. 105.1; see also id. 202 (defining "building official" to include a building commissioner); Mass. Gen. Laws ch. 143, § 3 (directing municipalities to appoint building commissioners "to administer and enforce the state building code"). The permit must be based on specific plans that display and explain the proposed work. 780 Mass. Code Regs. 105.3(4), 107.1, 107.2. Under Massachusetts law, no construction work may be done that is not approved in the building permit unless state law otherwise authorizes it. See id. 105.1-105.2, 105.4.

The submitted plans must "[i]ndicate the use and occupancy for which the proposed work is intended." Id. 105.3(3). Massachusetts has adopted the 2015 version of the International Building Code (the "IBC 2015") with some amendments. See id. 101.1. The IBC 2015 requires plans to employ use designation groups. IBC 2015 § 302.1.[1] These groups are indicated by an alphanumeric code, such as A-2 or F-1. Id. Each use designation carries with it "requirements that are applicable to . . . the purposes for which the room or space will be occupied." Id.

Once construction is complete, the local building commissioner must issue a second permit, called a certificate of occupancy, before the structure can be used or occupied. 780 Mass.

_____

[1] The IBC 2015 is available at https://codes.iccsafe.org/content/IBC2015.

Code Regs. 111.1. The certificate of occupancy sets out, based on the use-designation code and compliance with other regulations, such as the state plumbing code, the maximum allowable occupancy of the space. Id. 111.2(8).

**B.**

St. Paul's is an Orthodox Christian monastic organization. It established the Shrine of St. Nicholas to practice and evangelize the Orthodox Christian faith.

On August 30, 2017, St. Paul's purchased property on Pleasant Street in Marblehead (the "Property") to serve as its monastic complex. The Property had a preexisting mixed-use structure on it, which St. Paul's planned to redevelop.

St. Paul's retained an architectural firm, Siemasko + Verbridge, to act as the registered design professional for the project. Architects at that firm, including John Harden, a partner at Siemasko + Verbridge who was primarily responsible for the project, drew up the plans that St. Paul's would need to submit in order to secure a building permit from the Town that would permit construction to begin.

The plans that Siemasko + Verbridge prepared for St. Paul's proposed converting the first floor of the existing structure on the site in question into three separate areas. One area would serve as a place in which monks could brew beer in accord with Orthodox Christian tradition. A second area would be

converted into a chapel for liturgical services. The last area was to be converted into a "fellowship hall" that would host Bible studies, prayer groups, religious education, communal religious meals, and overflow from the chapel. St. Paul's also intended to use the fellowship hall to serve the beer that the monks would brew.

The use designation codes set forth in the plans indicated that the use for the area designated to be the fellowship hall was an A-2 use. A-2 uses "include[] assembly uses intended for food and/or drink consumption including, but not limited to: Banquet Halls[,] Casinos (gaming areas)[,] Nightclubs[,] Restaurants, cafeterias and similar dining facilities (including associated commercial kitchens)[, and] Taverns and bars." IBC 2015 § 303.3.

The plans indicated that the use for the area designated to serve as the site of the chapel was an A-3 use. The IBC defines an A-3 use to include "assembly uses intended for worship, recreation or amusement and other assembly uses not classified elsewhere in Group A." Id. § 303.4. The IBC lists several examples of A-3 uses, including community halls, funeral parlors, lecture halls, museums, pool and billiard parlors, and places of religious worship. Id.

The plans indicated that the area designated to be the brewery was an F-2 use. The IBC defines use group F-2 as "[l]ow-

- 6 -

hazard factory industrial," meaning "uses that involve the fabrication or manufacturing of noncombustible materials that during finishing, packing or processing do not involve a significant fire hazard." Id. § 306.3.

To secure a building permit for the site, Andrew Bushell, who was the "protos" of St. Paul's and whom the parties refer to as "Father Andrew", submitted the plans sometime in June or July 2018 to Richard Baldacci, who was at the time the Marblehead Building Commissioner. Baldacci approved the plans, which included the use designations described above, and issued a building permit for the project on July 3, 2018.

The building permit listed Harden as the builder. Father Andrew signed the permit as the owner/agent, although the printed name was Harden's. The permit stated that the "proposed work" included a "change [in] the use of the first floor from a retail to an assembly, A-2," and the addition of "two bathrooms and [an] A-2 hour fire rated ceiling, a bar area with taps and a dishwasher, commercial kitchen and walk-in cooler and concrete slab."

In the Fall of 2018, Baldacci sent three letters -- one each in September, October, and November -- that notified Father Andrew that St. Paul's was "serving beer" on the premises of the Shrine even though no certificate of occupancy had been issued for the building. The second of these letters directed that the plaintiffs cease and desist using the fellowship hall "as a Group

- 7 -

A-2 Assembly" until an A-2 certificate of occupancy issued.  The third one notified Father Andrew that Baldacci had "issued a non-criminal Building Code Violation" and a fine.

St. Paul's appealed the violation to the state Building Code Appeals Board (the "BCAB").  The BCAB affirmed the violation.

In November 2018, Baldacci received an unsigned letter that bore the architectural license and stamp of a principal at Siemasko + Verbridge and that claimed that the Shrine was in compliance with the state plumbing code.  Baldacci requested that Harden provide "a Construction Control Affidavit, following an [i]nspection of the facility, or a code review addressing" various requirements that had to be met prior to full occupancy.

Harden replied to Baldacci's email.  Harden stated in his reply that "there is some confusion regarding the change of occupancy, the proposed project as drawn, and the request for a certificate of occupancy."  He added that he would review the requests and give thought to the work required.  He noted in conclusion that "we are working hard with Father Andrew to address your concerns" and "[w]e believe that everyone is trying to operate here in good faith."

Harden left Siemasko + Verbridge in December 2018. Thaddeus Siemasko, a principal at the firm, took over the project. That month, Siemasko met with Baldacci and other town officials to discuss topics related to the construction project at the Shrine.

According to a summary of the meeting that Siemasko prepared, the meeting participants agreed that the new use of the fellowship hall would be an "A" use.

At this meeting, Baldacci restated his position that all work authorized by the permit had to be completed before any beer was served on site. Following the meeting, according to an email Siemasko sent Baldacci the next day, Siemasko sent notes describing the discussion to Father Andrew. Siemasko reported to Baldacci that Father Andrew had called Siemasko to express his frustration that Baldacci had not advocated for a higher occupancy of the first floor based on a more generous interpretation of the state plumbing code.

## c.

On January 7, 2019, Siemasko + Verbridge informed Baldacci that it had withdrawn from the project. That left the project without "a Registered Design Professional to provide construction control and a licensed professional to supervise the project."

That being so, Baldacci notified Father Andrew that he was suspending the building permit that had been issued. In addition, Baldacci directed that construction cease and desist "until such time that the building department receives a new Initial Construction Control Affidavit from a Massachusetts

Architect and a Licensed Construction Supervisor agrees to take responsibility for the construction project."

On February 6, 2019, St. Paul's' attorney sent a letter to Marblehead Town Counsel and copies of it to Baldacci and other Town officials. The letter stated that "the proper characterization of [the Property] for the purposes of the Building Code is as a house of worship and as a monastery for purposes of the Plumbing Code." The letter argued that a failure to recognize that characterization "represents an impermissible judgment by the Town and its officials about what constitutes religious exercise." The letter noted that "work is ongoing and all of the rooms within the first floor of 124 Pleasant Street including the chapel, entry way, fellowship hall [sic] are routinely used for religious purposes." The letter also requested "that the Town issue an occupancy permit for 99 occupants at St. Nicholas."

Baldacci wrote a letter to St. Paul's attorney in response. The letter stated that the submitted plans on which the then-suspended building permit had been based had designated the fellowship hall as an A-2 use under the IBC, rather than as a monastery, which would have been an R-2 use. The letter stated as well that Baldacci agreed with the A-2 designation indicated in those plans.

In addition, the letter stated that a monastery use designation -- as an R-2 use -- would "limit[] the occupants [of

- 10 -

the structure] to members" of the monastery and that a certificate of occupancy for 99 occupants would require the construction of at least three toilets.  Baldacci also noted that because there were two existing toilets in the structure he could "issue a building permit" for an A-3 use permitting up to 60 occupants in the structure when certain emergency lighting and alarm systems were "added to the entire building," but that St. Paul's could not use that permit to serve food or alcohol to the public "until the establishment of a Group A-2 occupancy, in accordance with" the originally issued building permit.

On February 13, 2019, Ryan McShera, a principal at Red Barn Architecture, emailed Baldacci and informed him that he would "tak[e] over Construction Administration" for St. Paul's.  McShera provided a new construction control affidavit, which listed the project title as "Monastery Renovation".

Baldacci responded nine days later.  He wrote in an email that the project was still "lacking a Construction Supervisor and an Architect of record."  In the email and an attached letter, he expressed concern that he was "not certain that the building permit accurately depicts the work proposed," and that it was not clear to him whether St. Paul's was changing the scope of the work from what had been indicated on the plans on which the building permit was based.

Specifically, Baldacci noted that McShera's affidavit described the project title as "Monastery Renovation." Baldacci thus requested a code review, including an analysis of the required number of toilets under the plumbing code, along with a set of shop drawings depicting the location of alarm systems. He wrote that "[i]f the scope of work has changed or the occupancy requested is not identical to that which was previously permitted, then the building department will close [the original permit] and a new application should follow."

McShera submitted the code review on May 1, 2019, although Baldacci apparently missed his email until May 6. McShera wrote that St. Paul's intended "to carry out the proposed work in accordance with the previously submitted plans," and that its "justification for this is based upon our code analysis." But, the code review indicated that Siemasko + Verbridge's use designations were incorrect and the building was a monastery that should be classified as R-2. McShera indicated that "the two new toilet rooms proposed" would be sufficient to meet plumbing code requirements. McShera wrote that "[w]e are working to hire a sub-contractor that will provide the requested shop drawings and information."

Baldacci and McShera (and possibly Father Andrew) had a telephone call on May 15. Baldacci memorialized that call in an

email to McShera and Father Andrew the following day, and McShera sent a response on May 31.

Baldacci's email recounted that Baldacci and McShera agreed on the required number of fixtures, that a change to an R-2 use designation would require the installation of automatic fire sprinklers, and that an A-3 use designation for the first floor would accommodate "the requested maximum 200 occupants." Baldacci also wrote that the parties agreed on the phone call "that, to continue serving beer to the public, a use group A-2 designation for the Fellowship Hall area will allow a maximum occupancy of up to 100 without the requirement of providing a Fire Sprinkler throughout the structure."

In addition, Baldacci conveyed in his email to McShera a request from the Town Director of Public Health for new plans. Finally, Baldacci stated that he would "release the building permit" "[w]hen we are in agreement with the code review and I am in receipt of a stamped plan from the health department, showing acceptance of the Fellowship Hall fixtures and sinks, per 2013 Food Code," and when he received "an application made by a plumbing and gas fitter and an electrician."

McShera wrote in response to Baldacci's email that Baldacci had, during the call, stated that the Marblehead Town Bylaws required an A-2 designation. McShera requested copies of those bylaws and the dates they were adopted. He also wrote that

the fellowship hall was not related to the type of uses provided as examples of A-2 uses in the IBC, and that, at any rate, "we do not see how this issue has an affect [sic] on lifting the suspension of our building permit since the underlying and previously permitted construction work has not changed."

With respect to the request to McShera from the Town's Director of Public Health that Baldacci had conveyed in his email, McShera responded that "the plan previously submitted has already been reviewed and approved," and "[w]e are not proposing any changes from what was originally approved for permit in regards to the fixtures being installed (all will meet health code requirements . . . )" (emphasis added). With respect to Baldacci's statement in his email that he would not reinstate the permit, McShera responded: "This is not what we discussed. You said you would un-suspend the permit last time we spoke. Please lift the suspension of the permit so that our carpenter may get underway constructing the new walls in the space. We are working to sign on licensed plumbers and electricians and will have them apply for permits once they are under contract."

Following this email exchange, on June 11, Baldacci wrote a letter to McShera in which he officially declined to reinstate the building permit that had been suspended. His letter stated that the appropriate use designation of the fellowship hall was A-2 and that that designation was required by the IBC, which

the state building code had adopted, rather than a Marblehead Bylaw.  Baldacci claimed that the IBC "does not provide any provision for allowing a place of religious worship, a group A-3 occupancy, to have a permanent accessory provision for serving beer to the public."  Baldacci, citing IBC § 105.3, wrote that "[u]ntil the use of the structure is agreed upon, I cannot lift the suspension of the building permit."  In response to McShera's statement in the prior email that plans had already been approved by the health department, Baldacci wrote that the health department required "an updated set of plans describing the Fellowship Hall bar area."

Baldacci concluded this letter by laying out two conditions that St. Paul's would have to meet before he reinstated the building permit that had been suspended.  First, Baldacci stated, St. Paul's would have to submit "an updated set of plans describing the Fellowship bar area along with the health department stamped and approved fixtures."  Second, he stated, St. Paul's would have to agree "to declare the use of the Fellowship Hall an A-2 use group occupancy with a maximum occupancy of 100," or obtain "a Variance from the Building Code of Appeals Board allowing an accessory use to the group A-3, Place of Worship."  As Baldacci had done in each prior letter, he added a sentence describing St. Paul's' right to appeal his decision to the BCAB.

**D.**

St. Paul's filed the complaint in this case in the District of Massachusetts on July 9, 2019, along with a motion for preliminary injunctive relief. St. Paul's also appealed Baldacci's refusal to reinstate the permit to the BCAB on July 25, 2019.

The BCAB held a hearing on August 20, 2019. At the hearing, according to the BCAB decision, St. Paul's "represented . . . that they want to complete the project fully in accordance with the original plans that were approved as part of issuing the building permit on July 3[, 2018]" (emphasis in original). St. Paul's further represented "that it fully understands the risks associated with completing the project in accordance with the original plans, especially if, later, there are changes in Use Group and/or change of occupancy which could require further physical changes to the building (based on, among other things, changes in occupant loads)." The BCAB noted that, "[a]s a result, [St. Paul's] was clear; it will 'abide by the letter of the existing [building] permit'" (alteration in original).

On September 24, 2019 the BCAB issued a conditional order, to which the Town did not object. The condition regarding health department approval mirrored the one Baldacci had set out in his June 11 letter, except that, rather than requiring anything specific regarding the use dispute, the BCAB's second condition

stated only that "all submissions from Appellant to the Building Department made after January 15, 2019 [would] be disregarded." The Building Permit was deemed to be reinstated following the issuance of the order.

Following the BCAB decision, St. Paul's withdrew its motion for preliminary injunctive relief in this case. St. Paul's then moved for partial summary judgment once discovery had been completed. The defendants filed a cross-motion for summary judgment. The District Court denied St. Paul's' motion and granted the defendants' cross-motion. This appeal from the denial of St. Paul's motion for summary judgment and the grant of the cross-motion followed.

## II.

RLUIPA prohibits local governments from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," outside of narrow circumstances. 42 U.S.C. § 2000cc(a)(1). A "land use regulation" is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has" certain property interests "in the regulated land." Id. § 2000cc-5(5).

- 17 -

The District Court granted summary judgment to the defendants on two independent grounds: (1) the defendants, in refusing to reinstate the building permit, had not "impos[ed] or implement[ed] a land use regulation" (emphasis added); and (2) if the defendants had imposed "a land use regulation" by refusing to reinstate that permit, no juror could reasonably find on this record that the defendants' actions in doing so substantially burdened the plaintiffs' religious exercise. St. Paul's Found. v. Baldacci, 540 F. Supp. 3d 147, 154, 157 (D. Mass. 2021). Because we agree with the District Court's latter holding (if not all of the reasoning underlying it), we do not address whether the Town implemented "a land use regulation." See San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1036 (9th Cir. 2004) (taking this approach); Lin v. TipRanks, Ltd., 19 F.4th 28, 36 (1st Cir. 2021) ("We . . . may affirm the District Court's ruling on any ground manifest in the record.").

**A.**

We have previously identified several "factors that courts have considered relevant when determining whether a particular land use restriction imposes a substantial burden on a particular religious organization." Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 98 (1st Cir. 2013). These include "whether the regulation at issue appears to target a religion, religious practice, or members of a religious

organization because of hostility to that religion itself"; "whether local regulators have subjected the religious organization to a process that may appear neutral on its face but in practice is designed to reach a predetermined outcome contrary to the group's requests"; and "whether the land use restriction was 'imposed on the religious institution arbitrarily, capriciously, or unlawfully.'" Id. at 96-97 (quoting Westchester Day Sch. v. Village of Mamaroneck, 504 F.3d 338, 350 (2d Cir. 2007)).

"[L]ocal regulators" may be found to have acted arbitrarily and capriciously when they "disregard objective criteria and instead act adversely to a religious organization based on the objections of a small but influential group" or "base their decisions on misunderstandings of legal principles." Id. at 97. Conduct also may be deemed to be arbitrary and capricious if it is unlawful under state or local law, see Westchester Day Sch., 504 F.3d at 351-52, or where it "evince[s] animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around," Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, 980 F.3d 821, 832 (11th Cir. 2020).

St Paul's expressly states in its briefing to us that, in seeking to overturn the District Court's grant of summary judgment to the defendants with respect to the "substantial burden"

issue, it is challenging the District Court's ruling only with respect to the determination that no reasonable juror could find that the defendants' refusal to reinstate the permit, and thus their "prohibit[ion] of all construction at the Shrine" was "arbitrary and capricious."[2] St. Paul's presses this contention

---

[2] St. Paul's does not argue that its religious exercise would have been substantially burdened merely by the Town's designation of the "fellowship hall" as an A-2 rather than an A-3 use. It argues only that the Town's refusal to permit any construction while this issue regarding the dispute over the A-2 versus the A-3 use designation was resolved was arbitrary and capricious and for that reason substantially burdened its religious exercise. Thus, although the record shows that St. Paul's' preferred outcome was not an A-2 use designation, we do not understand St. Paul's to be arguing on appeal that it was subject to a process that may have appeared neutral on its face but in practice was designed to reach a "predetermined outcome contrary to the group's requests," Roman Cath. Bishop of Springfield, 724 F.3d at 96. We therefore treat any such argument as waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). St. Paul's also makes no argument that "the land use restriction was imposed on [it] . . . unlawfully," Roman Cath. Bishop of Springfield, 724 F.3d at 96-97, that it was targeted by a land use regulation because of hostility to Orthodox Christianity, or that some factor not yet defined in our case law demonstrates a substantial burden.

Moreover, we emphasize that St. Paul's argues to us only that the defendants acted arbitrarily and capriciously by refusing to reinstate the permit in full, without at any point suggesting that the defendants so acted because they refused to reinstate the building permit in part, such that construction in at least the areas designated to be for the chapel and the brewery (but not the fellowship hall) could go forward under that partially reinstated permit. Thus, any such argument is also waived. Zannino, 895 F.2d at 17. We do note, though, that there is nothing in the record to suggest that a request for a partial reinstatement was made by St. Paul's during the extensive back and forth over reinstatement with Baldacci. We note, too, that St. Paul's has not identified any authority under state law that would allow such a partial reinstatement.

by pointing to the evidence that shows that Baldacci -- and thus the Town -- refused to reinstate the original building permit between February 13, 2019, when McShera submitted a new construction control affidavit, and September 24, 2019, when the permit was reinstated following the BCAB's conditional order.

Summary judgment is appropriate if "no 'reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the [plaintiffs],' could resolve the dispute in the plaintiffs' favor."  Hill v. Walsh, 884 F.3d 16, 21 (1st Cir. 2018) (alteration in original) (citation omitted) (quoting Cortés-Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 187 (1st Cir. 1997)).  The question, then, is whether a reasonable juror could find on this record that Baldacci's reason for refusing to reinstate the building permit during that period was not a permissible exercise of discretion and was instead an arbitrary and capricious wielding of it.  Reviewing de novo, see Laureano-Quiñones v. Nadal-Carrión, 982 F.3d 846, 848 (1st Cir. 2020), for the reasons that we will next explain, we conclude that no reasonable juror could so find.

**B.**

There is no dispute that the plans that Baldacci had approved when he had originally issued the building permit provided for two "A" uses and one "F" use and for fixtures and infrastructure appropriate to those use groups.  Nor is there any

- 21 -

dispute that, a week prior to McShera's submission of the new construction control affidavit, an attorney for St. Paul's had contacted Baldacci and said that the proper characterization of the use was as a "monastery," which is an R-2 use and so not a use that the plans had designated. In addition, there is no dispute that McShera's Construction Control Affidavit, which was submitted on February 13, called the project a "Monastery Renovation."

At least up through the May 15 phone call between Baldacci and McShera, moreover, the record shows -- indisputably, in our view -- that Baldacci declined to reinstate the permit because of St. Paul's' seeming description of the project in seeking the permit's reinstatement as involving an R-2 use when the plans that had been submitted initially to secure the permit for that project involved no such use. Indeed, St. Paul's identifies no evidence that indicates that Baldacci refused to reinstate the permit during this period for some reason other than the concern that he had about this deviation from the submitted plans in the request for the permit's reinstatement.

In that regard, we note that the record shows that Baldacci cited this discrepancy between the originally permitted plans and the proposed "monastery" use in his February 11 letter, repeated this same concern in his first email to McShera on February 22 by stating that he was "not certain that the building permit accurately depicts the work proposed," and stated again in

the letter attached to that email that "[i]f the scope of work has changed or the occupancy requested is not identical to that which was previously permitted, then the building department will close [the original permit] and a new application should follow."  In fact, the undisputed record further shows that Baldacci explained in the May 15 phone call (and St. Paul's agreed) that changing the intended use of the structure to a "monastery" use would require construction -- namely the installation of a sprinkler system "throughout" "the entire structure" -- that was not provided for in the approved plans.

St. Paul's does assert that in the letter that McShera sent to Baldacci that contained the code review, McShera wrote that "it is [St. Paul's] intent to carry out the proposed work in accordance with the previously submitted plans."  But, the record shows that, even as McShera was so representing, he was also informing Baldacci that he understood the project for which he was seeking the reinstated permit to entail an R-2 use, which the plans submitted to secure the permit in question did not show would be involved and, as Baldacci explained, could not accommodate because those plans did not provide for the necessary fire sprinkler system.

Thus, the record indisputably shows that, at least up until the May 15 phone call, Baldacci reasonably understood St. Paul's to be seeking reinstatement of the permit while proposing

to use the completed structure in a way that would require construction -- the aforementioned installation of sprinkler systems -- that Baldacci had never approved in initially granting the permit. In consequence, we do not see how Baldacci's refusal to reinstate the permit up until that time could be deemed arbitrary and capricious by a reasonable factfinder, as it hardly is unreasonable for a building commissioner to ensure that the party seeking to reinstate a permit is not engaged in a bait-and-switch. Nor does St. Paul's identify any authority to suggest otherwise, as none of the precedents to which it points in support of its position involves a refusal to reinstate a suspended permit in which the request for reinstatement was made by a party proposing construction for a project that would involve a use nowhere reflected in the plans submitted to initially secure the permit. See Roman Cath. Bishop of Springfield, 724 F.3d at 84–87; Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895, 899 (7th Cir. 2005); Westchester Day Sch., 386 F.3d at 185–86; Mintz v. Roman Cath. Bishop of Springfield, 424 F. Supp. 2d 309, 313, 319 (D. Mass. 2006); Layman Lessons Church v. Metro. Gov't of Nashville/Davidson Cty., No. 18-cv-0107, 2019 WL 1746512, at *1, *3 (M.D. Tenn. Apr. 18, 2019).

The record does supportably show that during that May 15 phone call McShera and Baldacci apparently agreed that St. Paul's would not pursue an R-2 use designation for any portion of the

project.  Thus, a reasonable factfinder could conclude that, at least from that point on, there was no longer any basis for Baldacci to be concerned that St. Paul's was pursuing a monastery use in connection with the project.  For that reason, St. Paul's contends, a juror reasonably could find that it was arbitrary and capricious for Baldacci to continue to decline to reinstate the permit at least as of the end of the phone call on May 15.

But, St. Paul's does not dispute that, even after that May 15 phone call, the record conclusively establishes that St. Paul's did not "agree[] to declare the use of the Fellowship Hall an A-2 use," which was the use designation in the original plans. Nor does St. Paul's dispute that the reason that Baldacci gave for declining to reinstate the suspended building permit from the May 15 phone call was that the plaintiffs refused to clearly state that they would follow the A-2 use designation and were suggesting instead that the proper designation for the use was A-3.

St. Paul's nonetheless argues that a juror reasonably could find that Baldacci's refusal to reinstate the permit was arbitrary and capricious because the A-2 and A-3 use designations do not require a different type of construction as an R-2 use would.  As St. Paul's sees it, because that is so, a juror reasonably could find that Baldacci could have issued the permit while the A-2/A-3 dispute was pending, thereby permitting the construction to continue and leaving the dispute over the use

designation to be resolved <u>after</u> construction had been completed. In St. Paul's' view, therefore, the record reasonably supports the conclusion that Baldacci's refusal to reinstate the permit without resolving the A-2/A-3 dispute first was "a delaying game," <u>Roman Cath. Bishop of Springfield</u>, 724 F.3d at 97, intended to force St. Paul's to agree to an A-3 use before any construction could resume and thus was arbitrary and capricious.

But, St. Paul's was not seeking a new building permit based on an A-3 use. Indeed, St. Paul's was never outright denied a building permit. It was seeking the reinstatement of a building permit that already had been issued based on plans designating the area in question as an A-2 use only and that had then been suspended for reasons that St. Paul's does not dispute were permissible. Thus, the decision that Baldacci had to make -- even after the May 15 phone call -- was whether to reinstate a suspended building permit that originally had been based on plans that showed one use designation when the party seeking that permit's reinstatement was not willing to confirm that same use designation applied to the project for which it was seeking the reinstated permit.

So, even after the May 15 phone call, we do not see what basis there would be for a juror to conclude that it was arbitrary and capricious of Baldacci not to reinstate the permit. After all, St. Paul's does not dispute that if it submitted new plans for a new permit, it would be required to designate a use code for

the area in question according to its planned use of that area. Thus, if, as St. Paul's was seeming to represent to Baldacci, it was planning an A-3 use, the plans that it would have needed to submit to secure a new building permit presumably would have to have contained that use designation and not the A-2 use designation reflected in the plans that it submitted in originally securing the permit. Yet, at no point did St. Paul's state clearly -- despite Baldacci's repeated requests that it do so -- that it understood that the permit that it was seeking to have reinstated was for only an A-2 and not an A-3 use and so would allow only that use if the requested reinstatement of it were granted.

To be sure, St. Paul's claims in its briefs that it "repeatedly told [the Town] that [St. Paul's] would scrupulously adhere to the building permit's limits." But, that carefully worded assertion fails to confront the fact that the record indisputably shows that throughout this period St. Paul's was unwilling to confirm that the use designation in the plans underlying the original permit still applied, just as that assertion fails to confront the fact that the record indisputably shows that it was St. Paul's unwillingness on that score that led Baldacci to refuse to reinstate the permit.

It is true that the BCAB did ultimately order the permit to be reinstated. But, it did so conditionally, and only after St. Paul's did precisely what the record indisputably shows that

it had not done over the long back and forth over reinstatement with Baldacci: made "clear" that "it will 'abide by the letter of the existing [building] permit'" (alteration in original). Thus, we do not see how a reasonable juror could find that St. Paul's was being "jerked around," Thai Meditation Ass'n, 980 F.3d at 832. If anything, then, the evidence shows that St. Paul's was more worthy of having that description attached to its conduct, given that it was willing to state before the BCAB what the record shows it had not been willing to state throughout the negotiations with Baldacci.

Nor does St. Paul's identify any authority in Massachusetts law -- and we are not aware of any -- that indicates that it is unreasonable under Massachusetts law for a building commissioner to require that a party seeking the reinstatement of a suspended building permit to confirm the use designations in the plans that it had submitted to secure that permit initially, unless the previously unapproved use would require a new type of previously unapproved construction. Indeed, the relevant provisions of state and local law would appear to support the conclusion that it is perfectly reasonable for a building commissioner to require such confirmation, given that permits may only be issued based on the plans submitted to secure them and that the plans must include use designations. See 780 Code Mass. Regs. 105.3 ("To obtain a permit, the owner or authorized agent

shall file a permit application . . . . Such applications shall: . . . Indicate the use and occupancy for which the proposed work is intended."); Marblehead, Mass., Bylaws § 30-9(A) ("Every person intending to . . . make additions or alterations in any building . . . shall before commencing the same . . . file an application for a permit with the Building Commissioner, on forms furnished by him which shall state the . . . purpose for which the building is to be used."); id. § 200-2(E) ("If subsequent to the issuance of a special permit, variance, or building permit, changes in approved . . . use are desired, the applicant shall inform the Building Commissioner in writing of these changes and his written approval must be obtained in advance of any work commencing."). So, this is not a case in which there is a record from which a juror could find that the defendants in declining to reinstate the permit prior to the BCAB ruling were acting out of step with their legal obligations, see Westchester Day Sch., 504 F.3d at 351-52.

Consistent with this conclusion, moreover, Baldacci was hardly obscure about his concerns or about the ways that St. Paul's could seek (if not ultimately obtain) a permit based on the use designation that it thought appropriate if it no longer thought the ones contained in the plans used to secure the permit in question were correct. To that point, the record establishes that Baldacci informed St. Paul's that it could seek a new permit, though he later implied that he would not approve an application

for it if the plans St. Paul's submitted were the same save for designating the use for the area of the project in question as an A-3 use precisely because he disagreed that an A-3 use designation could apply to the proposed use of that area. In addition, he made clear to St. Paul's that it could appeal any decision that he made with respect to his decision either not to reinstate the permit or to deny a new one to the BCAB. Thus, we do not see what, other than speculation, would allow a reasonable juror to find on this record that Baldacci's reason for declining to reinstate the permit was a desire to "gain leverage" through a "delaying game" rather than the reason that he repeatedly gave -- that St. Paul's was not willing to make clear that the use designations in the plans that had been submitted to secure the permit at issue were the ones that it was relying on in seeking to have that permit reinstated following its suspension. See Brader v. Biogen Inc., 983 F.3d 39, 53 (1st Cir. 2020) (noting that, to defeat a motion for summary judgment, a "nonmovant cannot rely on conclusory allegations, improbable inferences, and unsupported speculation" (internal quotation omitted)).

St. Paul's does contend that the various precedents cited above demonstrate that a juror reasonably could find on this record that the defendants' conduct was arbitrary and capricious at least after the May 15 call. But, we do not see how any of them do so, because, as we have already explained, none of them

involves a request to reinstate a permit that had been previously issued and suspended for a valid reason, let alone a request to do so in a circumstance in which Massachusetts law applied.  See Roman Cath. Bishop of Springfield, 724 F.3d at 84-87; Sts. Constantine & Helen Greek Orthodox Church, 396 F.3d at 899; Westchester Day Sc., 386 F.3d at 185-86; Mintz, 424 F. Supp.2d at 313, 319; Layman Lessons Church, 2019 WL 1746512, at *1, *3.  Accordingly, here, too, St. Paul's fails to advance a basis for reversing the grant of summary judgment.

**III.**

**Affirmed**.